UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,           )
                                    )
                                    )   Case No. 4:11-cv-00071-JHP-TLW
                                    )
              Plaintiff,            )
                                    )
       vs.                          )
                                    )
CONOCOPHILLIPS COMPANY,             )
                                    )
              Defendant.            )
                                    )

## OPINION AND ORDER

Now before the Court are Plaintiff United States' Motion for Summary Judgment (Dkt #

39), Defendant ConocoPhillips' Response in opposition thereto (Dkt. # 45), and the United

States' Reply (Dkt. #54), as well as ConocoPhillips' Motion for Summary Judgment (Dkt. # 38),

the United States' Response in opposition thereto (Dkt. # 44), and ConocoPhillips' Reply (Dkt. #

57). For the reasons stated herein, the United States' Motion for Summary Judgment is

GRANTED, and ConocoPhillips' Motion for Summary Judgment is DENIED.

I.     **Undisputed Factual Background[1]**

Based upon the undisputed facts in the instant case, the Court finds as follows:

A.     **BACKGROUND OF TAPS**

The Trans-Alaska Pipeline System is an 800-mile pipeline extending from the North

Slope of Alaska to the port of Valdez, in continuous operation since 1977. Crude oil originating

---

[1] The following facts are either undisputed—i.e., not specifically controverted by
ConocoPhillips in accordance with Local Civil Rule 56.1(c) and/or stipulated by the parties in
their proposed Agreed Pretrial Order (Dkt. #53)—or are described in the light most favorable to
ConocoPhillips.

from the North Slope flows through TAPS to a marine terminal at Valdez, where it is transferred to tankers for ultimate sale, or to one of three independent refineries connected to TAPS. Dkt. # 39, Undisputed Fact No. 1, at 2. Joint undivided interests in TAPS were owned by subsidiaries of major oil companies. *Id.*, Undisputed Fact No. 2, at 2. As of July 1, 1977, these included, among others, a subsidiary of Phillips Petroleum Company (with a 1.66% interest), a subsidiary of Atlantic Richfield Company (ARCO)[2] (with a 21% interest), and two subsidiaries of BP America, Inc. (with a combined 49.18% interest). *Id.*

Because the path of TAPS crosses land owned by the federal and Alaska state governments, the TAPS owners entered rights-of-way agreements with the United States and the State of Alaska in 1974. *Id.*, Undisputed Fact No. 3, at 3. In these rights-of-way agreements, TAPS owners agreed to dismantle and remove TAPS and restore the land to a satisfactory condition at their own expense when TAPS ceased operations. *Id.* The costs associated with this obligation are hereinafter referred to as "DR&R costs" (for Dismantling, Removal, and Restoration costs).

### B.    DISPUTE BETWEEN TAPS OWNERS AND IRS REGARDING DR&R COSTS

On its 1977 federal income tax return, Phillips claimed a deduction for its proportionate share of expected TAPS DR&R costs, amortized over a 25 year period starting July 1, 1977, even though it did not expect TAPS to be dismantled until at least 2003. *Id.*, Undisputed Fact No. 7, at 4. Other TAPS owners also claimed DR&R deductions as to TAPS on their

---

[2]  The ARCO subsidiary underwent several name changes throughout the years. For most of the relevant time period, the entity was named "ARCO Transportation Alaska, Inc.," so for convenience the Court will refer to this entity hereafter as "ATAI."

contemporaneous tax returns. *Id.* The IRS disallowed the TAPS owners' claimed DR&R deductions. *Id*.

The dispute regarding deductibility of DR&R costs in advance of actual performance of DR&R work focused on the so-called "all-events test," which governs "whether a business expense has been 'incurred' so as to entitle an accrual-basis taxpayer to deduct it . . ." Dkt. #39, Undisputed Fact No. 8, at 5, *quoting United States v. General Dynamics Corp.*, 481 U.S. 239, 242 (1987)(citations omitted). Under the all-events test as it then existed, "an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." *Id.*, *quoting* 26 C.F.R. ("Treas. Reg.") § 1.461-1(a)(2)(1986).

The IRS took the position that the TAPS DR&R obligation did not satisfy the all-events test and that no deduction for DR&R costs was allowable until those costs were actually incurred and paid. *Id.*, Undisputed Fact No. 9, at 4. Phillips and other TAPS owners argued to the contrary that the "all-events test" was satisfied from the moment "the landscape was disturbed in the construction of the Pipeline," (i.e., the 1975-77 tax years) even though no DR&R costs would actually be incurred until far into the future. *Id.*

In the Deficit Reduction Act of 1984, Congress amended the Internal Revenue Code to explicitly provide that the all-events test is not met until "economic performance" occurs (i.e., when payment is made or services are provided). *Id.*, Undisputed Fact No. 10, at 5, *citing* P.L. 98-369, § 91(a), *codified at* 26 U.S.C. § 461(h) (effective July 18, 1984). It is undisputed that the economic performance requirement of Section 461(h), if it applies, would foreclose any deduction for DR&R costs before TAPS is actually dismantled. *Id.*; *see also* Dkt. #53, Stipulated

Law No. 2, at 11. This amendment was not retroactive, however, and therefore did not foreclose the TAPS Owners' DR&R claims, which (they alleged) accrued during the construction of TAPS ending in 1977. Dkt. # 39, Undisputed Fact No. 10, at 5, *citing General Dynamics*, 481 U.S. at 243 n.3.

### C.     THE CLOSING AGREEMENT

On July 22, 1988, the IRS and the TAPS taxpayers executed a "Closing Agreement on Determination Covering Specific Matters" ("Closing Agreement") pursuant to 26 U.S.C. § 7121. Dkt. # 53, Stipulated Fact No. 18, at 6; Dkt. #40-1. In relevant part, the Closing Agreement provides as follows:

> NOW IT IS HEREBY DETERMINED AND AGREED for Federal income tax purposes that, on the basis of concessions made by the Owners and by the Internal Revenue Service, the examining agent's proposed adjustments relating to deductions with respect to DR&R costs are settled as set forth below. . . .
>
> 1. The Owners and their successors in interest shall be allowed an aggregate deduction of $900,000,000 in respect of DR&R costs with respect to TAPS (as it existed on July 1, 1977) for the period beginning July 1, 1977 and ending December 31, 2003, subject to the terms and conditions specified in paragraphs 2 through 6 below. Any successor in interest shall be considered an Owner for the remaining provisions of the Closing Agreement.
>
> 2. For each taxable year or part thereof during the period July 1, 1977 through the first to occur of December 31, 2003 or the month in which dismantlement of the TAPS facilities is completed, each Owner or successor in interest to such Owner shall be allowed a deduction for DR&R costs equal to the sum of the following amounts for each calendar month within such taxable year or part thereof:
>
> $$1/318 \times \$900{,}000{,}000 \times OI,$$
>
> where OI is such Owner's or successor in interests' proportionate ownership interest in TAPS, as of the close of business on the 15th day of such month.
>
> 3. No deduction with respect to DR&R costs, other than as specified in paragraphs 1 and 2, shall be allowed with respect to any change in estimated DR&R costs prior to actual dismantling of the TAPS facilities. . . .

* * * * *

6. Section 461(h) of the Internal Revenue Code of 1986 shall not be applied to limit or defer the deductions allowable pursuant to paragraphs 1 through 3 of this Agreement.

* * * * *

8, This closing agreement is binding upon, and shall inure to the benefit of, the parties' respective successors in interest, provided that any successor in interest of any Owner shall have expressly assumed such Owner's DR&R obligations, in which case such successor in interest shall be treated as an Owner. . . .

Dkt. # 40-1, at CP9227-31; *see* Dkt. # 53, Stipulated Fact No. 19, at 6.

Shortly before the Closing Agreement was executed, the two TAPS-owning subsidiaries of BP America merged, and the merged entity (eventually renamed BP Pipelines (Alaska.) Inc. and referred to herein simply as "BP Pipelines") succeeded to both companies' original interests in TAPS and concomitant DR&R obligations. *Id.*, Stipulated Fact No. 20 at 7 . Phillips BP Pipelines is the only entity specifically referred to in the Closing Agreement as a "successor in interest." Dkt. # 40-1, at CP9234, 9238. BP Pipelines continued to claim the deductions allowed pursuant to the amortization schedule set forth in the Closing Agreement as to its TAPS interests, claiming its final amortized advance DR&R deduction as of December 31, 2003. Dkt. # 39, Undisputed Fact No. 32, at12.

## D.    PHILLIPS' ACQUISITION OF ATAI

In 1999, BP and ARCO proposed to merge their global operations. As a condition to approving the BP-ARCO merger, the Federal Trade Commission and the State of Alaska required the divestiture of ARCO's entire Alaska business, including ATAI. Id., Undisputed Fact No. 16, at 8. Phillips emerged as the successful bidder for ARCO's Alaska business and acquired ARCO's Alaska business, including ATAI in 2000. *Id.*

As noted above, as of July 1, 1977, ATAI owned a 21% interest in TAPS. Between 1977 and the execution of the Master Purchase Agreement, ATAI acquired additional TAPS interests. On October 31, 1996, ATAI purchased a 1% undivided interest in TAPS from Mobil Alaska Pipeline Company. Dkt. # 53, Stipulated Fact No. 21, at 7. At some point before 2000, ATAI acquired an additional 0.295% TAPS interest. At the time of the 2000 transaction, ATAI therefore owned a 22.295% interest in TAPS. *Id.*, Stipulated Fact No. 23, at 7.

On its initial 2000 consolidated tax return, Phillips did not claim any tax benefit at all under the Closing Agreement for ATAI's TAPS interest. Dkt. # 39, Undisputed Fact No. 27, at 11. As a taxpayer in the IRS's Coordinated Examination Program, Phillips had the opportunity to disclose items resulting in adjustments to its filed returns during the examination without being subject to certain penalties. *Id.*, *citing* Rev. Proc. 94-69. As part of these "safe harbor" disclosures, Phillips identified its failure to claim five months' worth of ATAI's amortization deductions pursuant to the schedule provided in Paragraph 2 of the Closing Agreement. *Id.*

In a written response to an Information Document Request issued by the IRS during this examination, Phillips stated that the Closing Agreement "provides that the owners of TAPS are allowed a deduction for accrued DR&R for the years 1977-2003." Dkt. # 53, Stipulated Fact No. 38, at 9. That same response stated that the ownership percentage for ATAI was 21%. *Id.* Accordingly, Phillips requested an additional $2,971,698 deduction. *Id.* The IRS allowed Phillips to claim this deduction. *Id.*

On its original 2001 consolidated tax return, Phillips claimed ATAI's amortization deductions, again based on a 21% ownership interest, pursuant to the schedule provided in

Paragraph 2 of the Closing Agreement. *Id.*, Stipulated Fact No. 32, at 8. The IRS did not dispute that claimed deduction. *Id.*

**E.     ATAI'S ACQUISITION OF A 3.0845% INTEREST FROM BP PIPELINES**

In 2001, ATAI (now renamed Phillips Transportation Alaska, Inc.) purchased an undivided 3.0845% of TAPS from BP Pipelines (hereinafter, the "BP Pipelines transaction"). Dkt. # 39, Undisputed Fact No. 30, at 12.

On October 25, 2000, ATAI, Phillips, and BP Pipelines executed a Purchase & Sale Agreement, in which ATAI agreed to purchase an undivided 3.0845%  TAPS interest from BP Pipelines for $40 million, and assume the related DR&R obligations as to that interest. Dkt. # 53, Stipulated Fact No. 41, at 9. The transaction was consummated on October 18, 2001, when ATAI and BP Pipelines executed a Form of Assignment and Bill of Sale. *Id.*

On its initial 2001 consolidated return, Phillips did not claim any deduction as to the TAPS interest acquired from BP Pipelines. Dkt. # 39, Undisputed Fact No. 32, at 12. On BP's 2001 consolidated tax return, BP Pipelines recaptured the tax benefits it had previously claimed under the Closing Agreement on its 2001 tax return as to the 3.0845% interest, because BP Pipelines no longer owned the interest and had been relieved of the DR&R obligation associated with that interest, while continuing to claim the Closing Agreement tax benefits on TAPS interests it retained until the amortization schedule ended in 2003. *Id.*

**F.     CONOCOPHILLIPS' AMENDED TAX RETURNS**

On September 4, 2008, ConocoPhillips filed an amended return and claim for refund for the 2000 tax year. Dkt. # 53, Stipulated Fact No. 46, at 10. In that amended return, ConocoPhillips claimed an increase in its tax basis in ATAI's TAPS interest by the amount of

the DR&R-related deduction it concluded that ATAI had previously been entitled to take pursuant to the Closing Agreement (approximately $174 million). Dkt. # 40-8, at CP73. ConocoPhillips then sought to depreciate or amortize (i.e., deduct over time) this increased basis over a 15-year period. Id. This is referred to hereafter as the "basis-increase claim."

The IRS Service Center paid a refund to ConocoPhillips with resepct to the 2000 refund claim, by check dated February 5, 2009, in the amount of $2,281,653. Dkt. # 53, Stipulated Fact No. 47, at 10; Dkt. .# 40-11, at CP410. The IRS subsequently determined that ConocoPhillips is not entitled to $2,215,434 of that refund. *Id.*

On May 9, 2010, ConocoPhillips filed an amended return and claim for refund as to its 2001 tax year. Dkt. # 53, Stipulated Fact No. 48, at 10. ConocoPhillips made a basis-increase claim to ATAI's TAPS interest as it had in its amended 2000 tax return. Dkt. # 40-10, at CP372. ConocoPhillips also asserted a basis-increase claim for the TAPS interest acquired in the BP Pipelines transaction, increasing its tax basis in that interest by the amount of the DR&R-related deduction it concluded that BP Pipelines had previously been entitled to take pursuant to the Closing Agreement (approximately $25 million). *Id.* at 374. The 2001 refund claim also sought additional "going-forward deductions" under the Closing Agreement's amortization schedule as to the 3.0845% interest ATAI acquired from BP Pipelines in 2001 (a $261,892 deduction) and the 1.295% interest acquired by ATAI between 1977 and 2000 (a $439,812 deduction). *Id.* at CP372, 374. The IRS did not act on the 2001 refund claim. Dkt. # 53, Stipulated Fact No. 49, at 10.

### G. PROCEDURAL HISTORY

On February 2, 2011, the United States filed a timely complaint in this court under 26 U.S.C. § 7805(b) seeking to recover the erroneous refund. Dkt. # 2. On March 30, 2011, ConocoPhillips filed a timely counterclaim under 26 U.S.C. §7422 for a refund of overpaid tax for tax year 2001 and, as an alternative counterclaim in the event the United States' complaint is not dismissed in its entirety, for a refund of overpaid tax for tax year 2000. Dkt. # 7, 10. On March 15, 2012, both parties filed motions for summary judgment. Dkt. # 39, 40. Both motions concern the same issue: whether ConocoPhillips is entitled to the contested refunds claimed on its 2000 and 2001 amended tax returns.[3]

## II. Analysis

### A. STANDARD OF REVIEW

Summary judgment is proper "if the movant shows there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id.* at 249. In making the summary judgment determination, the Court examines the factual record and draws reasonable inferences therefrom in the light most favorable to the non-moving party. *Simms v. Oklahoma*, 165 F.3d 1321, 1326 (10th Cir.1999). The Court also interprets the rule in such a way

---

[3] The parties do not contest the other elements of their respective causes of action. Dkt. # 53, Stipulated Law No. 9, at 11.

as "to isolate and dispose of factually unsupportable claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986).

## B.     THE CLOSING AGREEMENT

It is undisputed that, but for the Closing Agreement, ConocoPhillips could not increase its basis in TAPS or otherwise claim a tax deduction for future DR&R costs as to the TAPS interests acquired in 2000 and 2001, because 26 U.S.C. § 461(h) requires actual economic performance of DR&R activity before any deduction could be claimed. Dkt. #53, Stipulated Law No. 2, at 11; *see also Caltex Oil Venture v. Comm'r,* 138 T.C. No. 2, 2012 WL 95557, at *4 (Tax Ct. 2012) (as to 1999 transaction, "even though the old 'all events test' might be met for one tax year because the taxpayer's liability for payment became fixed and determined in that year, under the rules now applicable to accrual-basis taxpayers, a deduction is allowed for that year only if the economic performance test of section 461(h) is satisfied as well.") Therefore, the question before the Court is whether the Closing Agreement permits ConocoPhillips to claim the advance DR&R deductions it seeks.[4]

IRS closing agreements are contracts governed by statute and federal common law contract principles. *Ellinger v. United States*, 470 F.3d 1325, 1336 (11th Cir. 2006), *quoting United States v. Nat'l Steel Corp.*, 75 F.3d 1146 (7th Cir. 1996)(Posner, C.J.). Under federal common law contract principles, where the essential terms of a contract are unambiguous a court, "will not look beyond the four corners of the document to determine the parties' intent." *Id.*, at 1338, *quoting Rink v. Comm'r*, 47 F.3d 168, 171 (6th Cir. 1995)); *Geringer v. Comm'r*,

_____

[4]  It is undisputed that the TAPS Owners incurred no DR&R expenses before December 31, 2001, Dkt. # 39, Undisputed Fact No. 6, at 4, so all the claimed DR&R deductions at issue in the2000 and 2001 tax years are deductions claimed in advance of actual economic performance.

T.C. Memo. 1991-32, 1991 WL 6421 (Tax. Ct. 1991)("The limited scope of the closing agreement does not make it ambiguous. The agreement is simply limited to those matters contained therein.") This basic rule of contract interpretation carries special force in the case of IRS closing agreements, which must be strictly construed to address "only matters specifically spelled out in a closing agreement as being resolved will be treated as settled." *Ellinger*, 470 F.3d at 1337 (citations and internal quotations omitted).

While a court can resolve ambiguous or conflicting terms within a closing agreement, it cannot alter or add provisions to the agreement. *Marathon Oil Co. v. United States*, 42 Fed. Cl. 267, 275 (Fed. Cl. 1998), *aff'd*, 215 F.3d 1343 (Fed. Cir. 1999)(closing agreements must be interpreted as fully integrated agreements). The very title, "Closing Agreement *on Determination of Specific Matters*," reinforces that matters not specifically addressed in the agreement are not part of the agreement at all. *Zaentz v. Comm'r*, 90 T.C. 753, 766 (Tax Ct. 1988)(closing agreement on the "specific matter" of allocating profits and losses among trusts did not preclude IRS from subsequently asserting that the trusts themselves were shams); *see also Bethlehem Steel Corp. v. United States,* 270 F.3d 135, 142-44 (3d Cir. 2001) ("[i]n light of the [Closing] Agreement's self-consciously limited scope, its silence regarding these matters unambiguously demonstrates that they were simply not terms agreed upon by the parties."); *see also Wolfgang v. Mid-America Motorsports, Inc*., 111 F.3d 1515, 1524 (10th Cir. 1997) ("[t]he intention of the parties and the meaning of the contract are to be determined from the instrument itself where the terms are plain and unambiguous").

Both parties seek summary judgment as a matter of law based on the express terms of the Closing Agreement. While the parties disagree as to the proper interpretation of the Closing

Agreement, the text itself is not in dispute, and neither party offers extrinsic evidence supporting an interpretation contrary to the plain meaning of the text. "[A]n ambiguity is not 'manufactured' simply because the parties claim alternative interpretations. Instead, the determination of whether a contract is ambiguous is a question of law." *MCI Worldcom Network Services, Inc. v. USCarrier Telecom, LLC*, Case No. 4:04-cv-840, 2005 WL 3466635, at *2 (N.D. Okla. Dec. 19, 2005)(Payne, J.), *citing Gamble, Simmons & Co. v. Kerr McGee Corp.*, 175 F.3d 762, 767 (10th Cir. 1999) *and Elliot Indus. v. BP Am. Prod. Co.*, 407 F.3d 1091, 1108 (10th Cir. 2005); *accord Tanadgusix Corp. v. Huber*, 404 F.3d 1201, 1205 (9th Cir. 2005)(same principles apply under federal common law of contracts, which applies to contracts made with the United States under federal law)(footnotes omitted). Once a contract is determined to be unambiguous, its interpretation is likewise a question of law. *Id., citing Dillard & Sons Constr., Inc. v. Burnup & Sims Comtec, Inc.*, 51 F.3d 910, 914 (10th Cir.1995).

Accordingly, this Court must determine whether the plain language of the Closing Agreement is ambiguous, and if unambiguous, the Court must then determine the correct interpretation of the Closing Agreement. The task of interpreting the Closing Agreement thus begins with the text of the document itself.

First, the Closing Agreement provides for tax benefits according to a specific amortization schedule, providing an aggregate total of $900 million in tax benefits to the TAPS Owners subject to the terms and conditions of the Closing Agreement. Dkt. # 40-1, ¶¶ 1, 2 at CP9227-28. That amortization schedule provides for deductions to be taken in proportion to each TAPS Owner's ownership interest in monthly installments from July 1, 1977 through December 31, 2003, according to a specific formula. *Id.*, ¶ 2 at CP9228. The Closing Agreement does not

contain a provision allowing the inclusion of DR&R costs into the tax basis of a TAPS interest. Indeed, such a provision would result in tax benefits beyond those set forth in the amortization schedule.

Second, this amortization schedule is the only DR&R tax deduction in advance of actual economic performance allowed in the Closing Agreement. *Id.*, ¶ 3 at CP9228-29. Paragraph 3 of the Closing Agreement is explicit: "No deduction with respect to DR&R costs, other than as specified in paragraphs 1 and 2, shall be allowed with respect to any change in estimated DR&R costs prior to actual dismantling of the TAPS facilities." *Id.*

Third, the Closing Agreement provides that Section 461(h) shall not apply to the specific deductions provided in the amortization schedule. *Id.*, ¶ 6 at CP9230-31. The text of this paragraph explicitly provides that the application of Section 461(h) is precluded only for "the deductions allowable pursuant to paragraphs 1 through 3 of this Agreement." *Id.* This language incorporates both the amortization schedule in paragraphs 1 and 2 and the restriction in paragraph 3 that no other advance DR&R deduction shall be allowed.

Fourth, for purposes of the above provisions, "[a]ny successor in interest shall be considered an Owner." *Id.*, ¶ 1, at CP9228; *see also id.*, ¶ 8 at CP9231 (A "successor in interest" to an Owner who assumes the Owner's DR&R obligations "shall be treated as an Owner"). The term "successor in interest" itself is not defined in the Closing Agreement.

Taken together, this language clearly and unambiguously states that the only advance DR&R deductions allowed under the Closing Agreement are those provided in the amortization schedule to TAPS Owners. It also provides that a successor in interest of a TAPS Owner can step into the shoes of its predecessor and take the remaining deductions in the amortization schedule.

But it does not provide for any advance DR&R deductions beyond that schedule. This interpretation gives effect to all the terms of the Closing Agreement. It is also faithful to the principle that closing agreements are interpreted narrowly to address only the specific matters contained therein.

Therefore, based on the unambiguous text of the Closing Agreement, the Court will examine each of ConocoPhillips' claims in turn.

## 1. THE BASIS-INCREASE CLAIM

As noted above, ConocoPhillips filed amended tax returns for 2000 and 2001 claiming an increase in its tax basis in TAPS by the amount of the DR&R-related deduction it concluded that ATAI (for the 2000 ATAI transaction) and BP Pipelines (for the 2001 BP Pipelines Transaction) had previously been entitled to take pursuant to the Closing Agreement. ConocoPhillips then sought to depreciate or amortize (i.e., deduct over time) this increased basis.

The Court has reviewed the Closing Agreement in its entirety and nowhere in the language of that agreement is there a reference to an increase in tax basis as an allowed advance DR&R tax benefit. The word "basis" itself only appears once in the Closing Agreement, in a recital stating that the Closing Agreement is made "on the *basis* of concessions made by the Owners and by the Internal Revenue Service." *Id.* at CP9227 (emphasis added.) This is clearly not a reference to an increase in tax basis. ConocoPhillips contends that the lack of any reference to an increase in tax basis permits the inference that the Closing Agreement allows successors in interest to claim advance DR&R deductions above and beyond the amortization schedule applicable to the original signatory Owners set forth in paragraph 2 of the Closing Agreement. According to ConocoPhillips, when Phillips acquired ATAI in 2000, it (Phillips and/or its new

subsidiary ATAI) became a "successor in interest" to ATAI for purposes of the Closing Agreement. The United States disagrees, arguing that whether or not Phillips is considered a successor in interest,[5] it is not entitled to any advance DR&R deductions except for the remaining installments on ATAI's proportionate share of the amortization schedule in paragraph 2.

The unambiguous language of the Closing Agreement supports the United States' interpretation. The Closing Agreement is not "silent" as to additional tax benefits attributable to DR&R above and beyond the amortization schedule. Paragraph 3 explicitly states, in unqualified language, that "no deduction with respect to DR&R costs, other than as specified in paragraphs 1 and 2 [i.e., the amortization schedule], shall be allowed." Similarly, paragraph 6 of the Closing Agreement does not provide a blanket waiver from the operation of Section 461(h). Rather, it specifically provides that Section 461(h) "shall not be applied to limit or defer the deductions allowable pursuant to" the amortization schedule in the Closing Agreement. Taken together, these provisions explicitly tie the limitation on the operation of Section 461(h) to the amortization schedule and provide that no deductions beyond that schedule "shall be allowed.") These provisions support the interpretation that any additional tax benefits, including ConocoPhillips' basis-increase claim, are subject to Section 461(h).

Nor does the text of the Closing Agreement support ConocoPhillips' contention that a successor in interest is subject to different terms than an Owner. The agreement provides that

---

[5] The Court need not decide whether or not ConocoPhillips and/or ATAI qualify as successors in interest under the Closing Agreement, because the IRS allowed ConocoPhillips's claimed "going-forward" deductions under the Closing Agreement for a 21% TAPS interest owned by ATAI and does not dispute those claimed deductions here.

successors in interest shall be "treated as Owners" and "shall be considered [] Owner[s]." This language supports the interpretation that a successor in interest may step into the shoes of the Owner and take the remaining deductions allowable to Owners under the amortization schedule. The explicit language restricting the allowed tax benefits to the amortization schedule discussed above provides further support for the view that successors in interest may only enjoy, if otherwise eligible, the remaining installments under the amortization schedule.

Based on this unambiguous language, the Court holds that ConocoPhillips is not entitled to increase the tax basis of the TAPS interests acquired in 2000 and 2001 to include an advance DR&R deduction. Accordingly, ConocoPhillips was not entitled to the refund it received from the IRS as to the 2000 tax year related to its basis-increase claim. None of the other elements for recovery of an erroneous refund are contested. Dkt. # 53, Stipulated Law No. 9, at 11. Accordingly, it is appropriate for the Court to award summary judgment in favor of the United States on its complaint. *See Johnson v. United States*, 228 F. Supp. 2d 1218, 1224 (D. Colo.), *judgment amended,* 211 F.R.D. 633 (2002), *aff'd*, 76 Fed. Appx. 873 (10th Cir. 2003)(awarding affirmative summary judgment to United States on its counterclaim to recover erroneous refund because all elements were established). Further, based on this analysis, ConocoPhillips is not entitled to a refund based on the basis-increase claim in the 2000 and 2001 tax years. Therefore, as to the basis-increase portion of the counterclaim, the United States is entitled to summary judgment in its favor as well.[6]

---

[6] ConocoPhillips makes two alternative "protective" claims for refund, apparently predicated on the possibility that DR&R costs should properly be characterized as business expense deductions instead of additions to tax basis. *See* Dkt. # 10, ¶¶ 32-35 (seeking the demanded deductions either in a lump-sum in 2000 as to the ATAI transaction and 2001 as to the BP Pipelines transaction, or in installments through 2003 for both). The Court need not pass on

## 2. THE GOING-FORWARD CLAIM

This leaves the remainder of ConocoPhillips' counterclaim as to the 2001 tax year related to its claimed "going-forward" DR&R deductions. In its 2001 refund claim, ConocoPhillips claims a $261,892 "going-forward" DR&R deduction as to the 3.0845% TAPS interest acquired in the BP Pipelines transaction, and a $439,812 "going forward" DR&R deduction based on what it contends is the "correct" TAPS ownership percentage of ATAI (22.295%), as opposed to the percentage provided in the Closing Agreement (21.00%). The difference derives from 1) ATAI's purchase of a 1% TAPS interest from a Mobil subsidiary in 1996, which, like Phillips' 2001 purchase from BP Pipelines, was structured as an asset sale, and 2) an additional 0.295% of TAPS ATAI acquired in an unexplained way after 1977.

The United States agrees that ATAI in fact owned 22.295% of TAPS, not just 21%, when Phillips acquired it, and later acquired a 3.0845% TAPS interest from BP Pipelines. The United States contends that ATAI was merely a third-party asset purchaser of the contested 4.3795% TAPS interests, and therefore is not a successor in interest under the Closing Agreement as to those interests. ConocoPhillips contends that successor-in-interest status is acquired by a purchase of a TAPS interest, even by an unrelated third party.

As stated supra, the Closing Agreement provides that a successor in interest to an Owner may complete the Owner's amortization schedule. The question before the Court is whether a

---

the appropriate character of DR&R deductions to resolve this motion, however, because Section 461(h) forecloses those options for the same reason as it precludes the basis-increase argument: *no* DR&R deductions may be taken until economic performance occurs. Nor is there any basis in the plain language of the Closing Agreement to support these protective claims, which both would result in deductions beyond those set forth in the amortization schedule and not otherwise allowed in the text of the Closing Agreement.

third-party purchase of a TAPS interest as an asset purchase makes the purchaser a "successor in interest" for purposes of the Closing Agreement. The term is undefined in the text of the agreement. The term is actually used in the Closing Agreement to describe the merger of two TAPS owners, with one common owner, into one entity. Dkt. # 40-1, at CP9234, 9238. The Closing Agreement also uses the term "predecessor in interest," apparently to describe transfers between affiliated corporations. The Closing Agreement does not use either term to refer to a third-party purchaser of a TAPS interest, however, which supports the United States' interpretation.

For further guidance, the Court looks to the meaning of "successor in interest" at the time it was drafted in 1988. *See, e.g., Resource Conservation Group v. United States*, 597 F.3d 1238, 1243 (Fed. Cir. 2010)("In construing statutory language, we look to dictionary definitions published at the time that the statute was enacted")(footnote omitted); *accord Flintkote Co. v. Gen'l Acc. Assur. Co.*, 410 F. Supp. 2d 875, 888 (N.D. Cal. 2006). According to the edition of Black's Law Dictionary in use in 1988, the definition of "successor in interest" is: "One who follows another in ownership or control of property. In order to be a 'successor in interest', a party must continue to retain the same rights as [the] original owner without change in ownership and there must be change in form only and not in substance, and transferee is not a 'successor in interest.' . . . In case of corporations, the term 'successor in interest' ordinarily indicates statutory succession as, for instance, when corporation changes its name but retains same property." Dkt. # 40-34, Black's Law Dictionary at 1283-84 (5th ed. 1979)(citations omitted). This definition is consistent with published appellate decisions using the term. *See, e.g. Holland v. Williams Mountain Coal Co.*, 256 F.3d 819, 822-823 (D.C. Cir. 2001) ("[a] party

simply acquiring property of a firm in an arm's length transaction, and taking up its business activity, does not become the selling firm's 'successor in interest'"); *Wimberly v. Mission Broadcasting Co.,* 523 F.2d 1260, 1262 (10th Cir. 1975)("the primary inquiry to be made in determining if one is a 'successor in interest.' . . . is whether there is a substantially similar identity of ownership and control after transfer of the business")(citations omitted).

ConocoPhillips relies on a definition of "successor in interest" from the 2009 edition of Black's Law Dictionary, which does not precisely match the text in the version actually in existence in 1988 when the Closing Agreement was executed. It is not appropriate to rely on a dictionary that was published 21 years after the Closing Agreement was drafted. *See, e.g., Resource Conservation*, 597 F.3d at 1243; *Flintkote*, 410 F. Supp. 2d at 888 ("the court is at a loss to see how a dictionary definition from almost forty years after the formation of the contract is relevant to understanding the meaning of the terms of that contract").

Even if the Court were to accept ConocoPhillips' definition of the term, ConocoPhillips would not prevail. Under that definition, "[a] successor in interest retains the same rights as the original owner, *with no change in substance*." Black's Law Dictionary 1570 (9th ed. 2009)(emphasis added). Here, there *was* a change in substance for the relevant TAPS interest, insofar as the tax law treatment of DR&R costs is concerned. The owner of a TAPS interest in 1977 could colorably argue that it was entitled to deduct some or all of the anticipated DR&R costs for TAPS from the moment "the landscape was disturbed in the construction of the Pipeline," (*i.e.*, the 1975-77 tax years). Dkt. # 39, Undisputed Fact Nos. 7-10, at 4-5. A taxpayer acquiring a TAPS interest after Section 461(h) became effective in 1984 could not make that argument. *Id.*, Undisputed Fact No. 10, at 5; Dkt. # 53, Stipulated Law No. 2, at 11. While the

IRS may have had reason to allow advance DR&R deductions in a compromise with the 1977 TAPS owners, it would have no reason to do so with taxpayers acquiring TAPS interests after Section 461(h) became effective.

Further, the Closing Agreement uses "successor in interest" in terms of the successor of the entity owning the TAPS interest, not of the TAPS interest itself. By its terms, the Closing Agreement applies only to "Owners *and their* successors in interest" and allows certain deductions for "each Owner or successor in interest *to such Owner*." Dkt. # 40-1, ¶¶ 1, 2, at CP9227-28 (emphasis added). Significantly, both BP's and Mobil's TAPS-owner subsidiaries continued to own TAPS interests themselves even after selling part of their ownership interests to ATAI in the relevant transactions. Dkt. # 53, Stipulated Fact Nos. 21, 45, at 7, 10.

The Court finds that Phillips (through ATAI) is not BP Pipeline's successor in interest, ATAI is not the Mobil subsidiary's successor in interest, and ConocoPhillips has not sustained its burden of showing that ATAI is a successor in interest of the remaining 0.295% interest. Accordingly, the Court holds that ConocoPhillips is not entitled to a refund with respect to the "going-forward" deductions for the 2001 tax year.

## C.     THE UNITED STATES' ALTERNATIVE GROUND REGARDING THE ATAI TRANSACTION

As an alternative ground for summary judgment with respect to the basis-increase deductions as to ATAI, the United States contends that ConocoPhillips is bound by an agreed allocation of the purchase price/tax basis for ATAI in the Master Purchase Agreement, which does not include an addition to tax basis for DR&R costs. The Court holds supra that the Closing Agreement does not allow ConocoPhillips to claim basis-increase deductions for ATAI, so the

Court need not decide the issue. However, for the sake of completeness the Court will address this issue as well.

### 1. Undisputed Facts

Phillips, ARCO, and BP executed a Master Purchase and Sale Agreement (the "Master Purchase Agreement") on March 15, 2000, for Phillips' acquisition of the ARCO Alaska business, including ATAI (hereinafter, the "ATAI Transaction"). Dkt. #53, Stipulated Fact No. 24, at 7; *see* Dkt. # 40-2 & 40-3. The Master Purchase Agreement was negotiated between sophisticated parties acting at arm's length who were represented by counsel after the opportunity for due diligence. Dkt. # 53, Stipulated Fact No. 25, at 7.

> Section 5.5(f)(i) of the Master Purchase Agreement provides in relevant part:
> Election. Sellers shall make a joint election with Purchaser under Section 338(h)(10) of the Code . . . with respect to each of the Companies [including ATAI] . . . Sellers and Purchaser shall exchange complete and executed copies of Internal Revenue Service Form 8023, required schedules thereto, and any similar state and foreign forms. If any changes are required in these forms as a result of information which is first available after the applicable Closing Date, the parties will promptly agree on such changes. . . .

Dkt. # 40-2, § 5.5(f)(i), at CP5668. Section 5.5(f)(ii) of that agreement provides in relevant part:

> Allocation of Purchase Price. Sellers and Purchaser will agree to an allocation of the purchase price (in accordance with relative fair market values and consistent with Schedule . . . 2.4(b)[7] . . . among the assets of the Companies [including ATAI] that are deemed to have been acquired pursuant to Section 338(h)(10) of the Code . . . Purchaser will prepare the initial draft of such purchase price allocation. Purchaser and Sellers shall use the asset values determined from such agreed-upon allocation for purposes of all

---

[7] Schedule 2.4(b) allocates $484 million of the overall purchase for the ARCO Alaska transaction to the purchase of the shares of ATAI. Dkt. # 40-2, § 2.4(b)(iii) & Schedule 2.4(b), at CP5645, 5708. The amount allocated to ATAI explicitly includes an assumed liability for certain bonds in the $484 million, *see id.*, supporting the United States' argument that the parties to the Master Purchase Agreement intended to include all assumed liabilities as part of the allocation.

reports and returns with respect to Taxes, including Internal Revenue Service Form 8594 or an equivalent statement.[8]

*Id.*, § 5.5(f)(ii), at CP5668.

As required by the Master Purchase Agreement, Phillips drafted the initial draft of Form 8023 for ATAI. Dkt. # 39, Undisputed Fact No. 24, at 10. After BP and Phillips reached agreement, the parties executed the final Form 8023 for ATAI and Phillips submitted the executed Form 8023 to the IRS on May 14, 2001. *Id.*; *see* Dkt. # 40-4. The Form 8023 does not include any amount for TAPS DR&R costs as an assumed liability. Dkt. # 53, Stipulated Fact No. 32, at 8. BP relied on the agreed amounts reported on Form 8023 for its own tax reporting purposes. Dkt. # 39, Undisputed Fact No. 24, at 10. So, initially, did Phillips. *Id.* The parties have never agreed to any changes to Form 8023 since it was filed with the IRS in 2001. *Id.* Nor has the Master Purchase Agreement been rescinded. Dkt. # 53, Stipulated Fact No. 34, at 8. In short, there is no evidence of a different agreement between the parties than that reflected in the Master Purchase Agreement and Form 8023.

When ConocoPhillips raised its basis-increase claim in its 2000 amended return and refund claim, it prepared a new version of Form 8023, adding $174 million to the purchase price/tax basis of ATAI. Dkt. # 40-12, at CP96-97. BP did not agree to this change and did not execute the new version of Form 8023. *Id.*; Dkt. # 39, Undisputed Fact No. 24, at 10.

_____

[8] Form 8594 is the form required for certain asset acquisitions under 26 U.S.C. § 1060. Like Form 8023, Form 8594 requires both the purchaser and seller to report an allocation of the purchase price among different asset classes. *See* Dkt. # 54-1, at CP3316. Given the similarity between the forms, the Court finds that Form 8023 is an "equivalent statement" to Form 8594 for purposes of the Master Purchase Agreement.

## 2. Analysis

The United States contends that the Master Purchase Agreement binds ConocoPhillips to the amount and allocation of Phillips' tax basis in ATAI's underlying assets reflected in the original Form 8023, because that allocation was agreed between the parties to the transaction. Because the Form 8023 does not include any amount of DR&R costs as "assumed liabilities," the United States argues that ConocoPhillips must accept the consequences of its agreed allocation and cannot increase its tax basis in ATAI after the fact without agreement from BP. ConocoPhillips contends that the omission of DR&R costs into ATAI's tax basis was the result of human error by its tax professionals, and ConocoPhillips is not bound to the allocation in the Form 8023.

Based on the unambiguous language of the Master Purchase Agreement, the Court determines that Phillips agreed to be bound by the allocation of the purchase price/tax basis of ATAI reflected on the original Form 8023. Section 5.5(f)(i) indicates that the parties agreed to prepare and file Form 8023 as to ATAI. It also indicates that the parties must agree on subsequent modifications to Form 8023, as evidenced by the provision that the parties "will promptly agree" to "changes . . . required in these forms as a result of information which is first available after the applicable Closing Date." If Phillips could unilaterally change the contents of Form 8023, there would be no need for a provision calling for prompt agreement between the parties in light of new information. Section 5.5(f)(ii) requires the parties to agree to an allocation of the purchase price "among the assets of" ATAI and use the agreed allocation on "all reports and returns with respect to Taxes." The only reasonable interpretation of this language is that Phillips and BP are bound by the agreed allocation in the Form 8023 that they prepared and filed.

"[W]here parties enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences." *Hamlin's Trust v. Comm'r*, 209 F.2d 761, 765 (10th Cir. 1954); *accord Nestle Holdings, Inc. v. Comm'r,* 152 F.3d 83, 87 (2d Cir. 1998)("a retroactive change in the form of [a] transaction" is "contrary to the rule that 'a taxpayer is free to organize his affairs as he chooses, [but] once having done so, ... he must accept the tax consequences of his choice, whether contemplated or not,'" *quoting Comm'r v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974) (additional citations omitted)). A taxpayer may not "disavow[] the form of an agreement in the absence of 'strong proof' that the parties intended a different arrangement." *Guaderrama v. Comm'r*, 21 Fed. Appx. 858, 861 (10th Cir. 2001) (citations omitted). There is no "strong proof" that the parties really meant to include DR&R costs as part of the purchase price allocation for ATAI. There is no proof at all to support that contention, and the Court sees no justification for setting aside an arm's length agreement between sophisticated corporations. Because Phillips agreed to be bound for all tax reporting purposes to the allocations in the original Form 8023, it must accept the consequences of that agreement and cannot unilaterally change that allocation after the fact.

The Court notes that BP followed the agreed Form 8023 allocation on its own tax return, relying on Phillips' representation in the Master Purchase Agreement that Phillips would also be bound. ConocoPhillips' unilateral change in the agreed allocation potentially whipsaws the IRS between the tax treatment BP (and Phillips) originally claimed under the Master Purchase Agreement and the tax position ConocoPhillips now claims based on its retroactive rewriting of that agreement. That is precisely the consequence that the "strong proof" rule is meant to avoid.

*Harvey Radio Laboratories, Inc. v. Comm'r*, 470 F.2d 118, 120 (1st Cir. 1972) ("for parties to agree on paper one way, benefiting one of them vis-a-vis himself, and then to permit the other to claim that the agreement was really something different, exposes [the IRS] to a whipsaw. This danger is one of the purposes of the 'strong proof rule.'")

For these reasons, the Court would grant summary judgment in favor of the United States on the basis-increase claim as to the ATAI transaction, even if it had not already done so based on the Closing Agreement.

ACCORDINGLY, IT IS ORDERED:

1. The United States' Motion for Summary Judgment (Dkt .# 39) is GRANTED, and ConocoPhillips' Motion for Summary Judgment (Dkt.# 38) is DENIED.

2. The parties are instructed to agree on tax computations and submit a separate form of judgment in accordance with the Court's decision within 15 days.

**It is so ordered this 23rd day of August, 2012**.

James H. Payne
United States District Judge
Northern District of Oklahoma